**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | |
|---|---|
| Zuffa, LLC, d/b/a The Ultimate Fighting Championship (UFC), ) ) ) | |
| Plaintiff, ) ) | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| vs. ) ) ) ) | **AS TO LIABILITY AND DENYING CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Reza T. Kamranian, Individually and as ) officer, director, shareholder and/or ) principalof Kamranian, Inc., d/b/a Reza's ) Pitch, a/k/a Reza's Pitch-Burgers & Beer, ) a/k/a Reza's Pitch Burgers & Beer; ) and Kamranian, Inc., d/b/a Reza's Pitch, ) a/k/a Reza's Pitch-Burgers & Beer, ) a/k/a Reza's Pitch Burgers & Beer, ) ) Defendants. ) | Case No.: 1:11-cv-036 |

Before the court is a motion for summary judgment by plaintiff Zuffa, LLC ("Zuffa") as to liability only and a cross-motion for summary judgment by defendants for dismissal. The court held a telephonic hearing on the pending motions on August 9, 2012.[1] Unless otherwise indicated, the facts set forth below have been established by the affidavits and other material submitted by the parties or were conceded during the telephonic hearing.

### I.   BACKGROUND

Zuffa is the copyright owner of the broadcast of an "Ultimate Fighting Championship" event identified herein as the "UFC #123 Broadcast" or simply the "Broadcast." The Broadcast included

---

[1] During the hearing, the court encouraged the parties to try to resolve the case without further court involvement. Thereafter, the court granted several requests for additional time for that purpose. However, the court has not heard anything from the parties for several months now, so the court presumes a settlement was not possible.

1

both a feature and undercard matches. Joe Hand Promotions, Inc. ("Joe Hand") is the exclusive commercial distributor of the Broadcast in the United States.

Reza T. Kamranian is the sole shareholder and operating officer of Reza's Pitch restaurant, a small sports bar in Bismarck, North Dakota, featuring "burgers and beer" with a soccer theme. Kamranian personally manages the restaurant and also assists with the cooking and customer service as needed.

The UFC #123 Broadcast originated on November 20, 2010, via satellite uplink for transmission by satellite signal to cable systems and satellite communications companies for commercial distribution either by closed circuit television or encrypted satellite signal. Joe Hand maintained a list of entities authorized to publicly exhibit the Broadcast. According to Joe Hand's records, defendants had not purchased the right to exhibit the UFC #123 Broadcast from either Zuffa or Joe Hand. Defendants have acknowledged this point.

On the evening of the Broadcast, investigator Brian Fox entered Reza's Pitch for the purpose of determining whether the restaurant was displaying the UFC #123 Broadcast without authorization. Fox had been retained to audit bars and restaurants in the Bismarck area that had not already purchased a license for the Broadcast to determine whether there was any unauthorized use. There is some suggestion in the record that he may have called Reza's Pitch prior to going there and was advised that the Broadcast would be shown.

According to an affidavit prepared by investigator Fox, he entered Reza's Pitch at about 9:30 p.m. and remained on the premises for about fifteen minutes. Fox stated that, after he arrived, a basketball game showing on some of the televisions ended and that a person, whom he presumed to be the owner or manager, went into the back room and, before he returned, the UFC #123

Broadcast began showing on three of the eight screens in the restaurant. He stated the Broadcast had already begun and that one of the undercard matches was in progress. Fox stated that there were approximately 28 patrons on the premises initially and that the number had dropped to 22 before he left. Fox made a video recording and took pictures to document the scene and the fact the restaurant was displaying the Broadcast. The record indicates that the maximum seating capacity for the restaurant is 110 persons.

Defendants do not dispute the contents of Fox's affidavit. In his own affidavit Kamranian acknowledges: (1) that his restaurant was open for business on November 20, 2010, and that he was working that evening; (2) that he searched for the UFC #123 Broadcast on the internet at the conclusion of the Dakota Wizards' basketball game and found a streaming broadcast of the event on the website firstrowsports.com; (3) that he fed the Broadcast to the three monitors in the restaurant that were connected to his computer; and (4) that defendants purchased neither a residential nor a commercial license to display the Broadcast.

Kamranian goes on to state that he had no reason to believe he could not stream and display the UFC #123 Broadcast from firstrowsports.com without paying a fee and disputes that he was "pirating" it. He states that no copyright notice appeared when he accessed the website and started streaming the Broadcast, nor did the website require registration, acceptance of terms of use, or that a fee be paid. He further claims there were advertisements for several nationally-prominent brands on firstrowsports.com, including Pizza Hut, Capella University, and Lenovo for its Thinkpad computers, which to him made the website appear legitimate.

Zuffa disputes that defendants were unaware that displaying the Broadcast was unauthorized. In particular, it attaches a "conditions of use" statement from the website FirstRow.net, which states

that permission to use the website is limited to personal, noncommercial use. However, while the name of this website is similar to the one that Kamranian states he accessed, it is different and insufficient evidence of what Kamranian may or may not have viewed on the website he claimed he accessed.[2]

Kamranian also states in his affidavit that, when he first started streaming the UFC #123 Broadcast, approximately 25 of the persons in the restaurant were persons associated with Dakota Wizards basketball team (family, friends, and fans), who had come to the restaurant to watch the Wizards play an "away" game. He said that his restaurant had advertised that during the season, it would be showing the "away" games for the Wizards, including advertising the showing of the game on the night in question. Kamranian stated the restaurant had not advertised it would be showing the UFC #123 Broadcast. Kamranian stated that a number of the group gathered for the Dakota Wizards game left shortly after the game ended, consistent with what auditor Fox reported. Kamranian states the UFC #123 Broadcast was already underway when he started streaming it, so only a portion of the Broadcast was shown. Kamranian stated that he has compared his gross receipts for that evening to other Saturdays in which no UFC Broadcast was shown and the results demonstrate that his restaurant experienced no financial gain from the Broadcast. Zuffa's counsel stated during the hearing on the pending motion that it probably would not dispute these points for purposes of assessment of damages if it would facilitate avoiding the costs and expenses of a trial on the damages issues.

---

[2] The court attempted to access both the firstrowsports.com and FirstRow.net websites as of the date of this order and notices came up for both stating that the domain names had been seized by U.S. Immigration and Customs.

Finally, and of particular importance to one of Zuffa's claims here, Reza's Pitch did not have a satellite hookup. Kamranian states he used his computer to stream the UFC #123 Broadcast from firstrowsports.com using internet service provided by Midcontinent Communications, a regional cable communications company, via a wired "cable" hookup to the restaurant. Zuffa's counsel stated during the telephonic hearing that it did not dispute these points.

## II.   DISCUSSION

Zuffa asserts two grounds for defendants' liability in this case. The first is that defendants violated provisions of the Communications Act of 1934, codified at 47 U.S.C. § 605(a). The second is that defendants are liable for copyright infringement under 17 U.S.C. § 501. These claims will be addressed separately.

### A.   Zuffa's claim under 47 U.S.C. § 605(a)

#### 1.   Introduction

Zuffa argues that the display of the UFC #123 Broadcast within Kamranian's restaurant violated the prohibitions contained in the first and third sentences of 47 U.S.C. § 605(a), which reads in its entirety as follows:

> (a) Practices prohibited
> Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by **wire or radio** shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any **radio** communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled

5

> thereto shall receive or assist in receiving any interstate or foreign communication by **radio** and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted **radio** communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

(emphasis added). Notably, the Communications Act of 1934, of which 47 U.S.C. § 605(a) is a part, distinguishes between "wire" and "radio" communications. And relevant here is that, while the prohibition in the first sentence of § 605(a) applies to both "wire and radio" communications, the prohibitions in sentences two through four are limited to "radio" communications.

### 2. Zuffa's claim under the "third sentence" of § 605(a)

In this case, the UFC #123 Broadcast originated as a satellite (*i.e.*, "radio") communication, but it was received by Kamranian's restaurant via Midcontinent's cable (*i.e.*, "wire") system. Presently, there is a split of authority over whether the provisions of § 605(a) that apply only to radio communications (including the third sentence relied upon by Zuffa here) apply to a communication received by wire from a cable communications provider when the communication originated as and was transmitted to the cable service provider by satellite (*i.e.*, "radio") communication. See, e.g., J & J Sports Productions, Inc. v. Torres, No. 2:11-cv-2439, 2013 WL 417748, *4 (E.D. Cal. Jan. 31, 2013) (discussing the split of authority); J and J Sports Productions v. Coyne, 857 F. Supp. 2d 909, 914 & n.2 (N.D. Cal. 2012) (same); Joe Hand Promotions, Inc. v. Sorota, No. 11–80985–civ, 2012 WL 2414035, **3-4 (S.D. Fla. June 26, 2012) (same).

Notably, the First, Third and Seventh Circuits have concluded that these provisions do not apply in this situation. Charter Communications Entertainment I, DST v. Burdulis, 460 F.3d 168, 172-178 (1st Cir. 2006); TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 199-202 (3d Cir. 2001); United States v. Norris, 88 F.3d 462 (7th Cir. 1996) ("Norris"); see J and J Sports Productions v. Coyne, supra (characterizing the cases). The Second Circuit, while acknowledging that the question is a close one, disagrees. International Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996) ("International Cablevision"). Notably, it does not appear that the Eighth Circuit has ruled on the issue.

After careful review, the court believes the decisions by the First, Third, and Seventh Circuits are more consistent with the relevant statutory language and legislative history than the Second Circuit decision. The reasons why are articulated in detail in those decisions and need not be repeated here. See also Joe Hand Promotions, Inc. v. Sorota, 2012 WL 2414035, **3-4; Joe Hand Promotions, Inc. v. WCI, Inc., No. 3:10–cv–422, 2011 WL 6755935, *3 (S.D. Ohio Dec. 22, 2011). More importantly, the court believes the Eighth Circuit would likely reach the same conclusion. Consequently, the court concludes that the prohibition in the third sentence of § 605(a) does not apply in this case.

Zuffa argues that this case is distinguishable from the First, Third, and Seventh Circuit cases cited above because the UFC #123 Broadcast was received by Kamranian's restaurant via Midcontinent's internet service as opposed to its cable service. The court disagrees. The critical distinction under § 605(a) according to the First, Third, and Seventh Circuit cases is whether the transmission from the cable communications provider to the alleged violator was by wire as opposed

to radio transmission. And here, Midcontinent provided Kamranian's restaurant with internet service by wire through its cable system.

### 3. The "first sentence" of § 605(a)

Zuffa's argument for liability under the first sentence of § 605(a) also fails, but for a different reason. While the first sentence applies to both wire and radio transmissions, it has been interpreted as prohibiting only the disclosure of these transmissions by communications personnel. E.g., TKR Cable, 267 F.3d at 201 (stating that the first sentence of § 605(a) prohibits "the divulgence of wire and radio transmissions by communications personnel"); Norris, 88 F.3d at 465 (same); Kingvision Pay Per View, Ltd. v. Duermeier, 24 F. Supp. 2d 1179, 1183 (D. Kan. 1998); Joe Hand Promotions, Inc. v. Rennard Street Enterprises, Inc., 954 F. Supp. 1046, 1051 (E.D. Pa. 1997); see International Cablevision, 75 F.3d at 131 & n.4 (concluding this was the most probable interpretation for reasons expressed by the district court below in International Cablevision, Inc. v. Noel, 859 F. Supp. 69, 75 (W.D.N.Y. 1994) (overruled on other grounds and citing Sen. Rep. No. 1097, 98th Cong., 2d Sess.108, reprinted in 1968 U.S.C.C.A.N. 2112, 2197)); Edwards v. State Farm Insurance Co., 833 F.2d 535, 540 (5th Cir. 1987); cf. National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 917 (6th Cir. 2001).[3]

---

[3] Defendants argue there is no liability under § 605(a), contending that it requires an active "interception" of the communication and not just an unauthorized display. Zuffa disagrees and notes that interception is not explicitly required for violations under either the first or the third sentences of § 605(a). Given the court's disposition of Zuffa's § 605(a) claims, this point need not be definitively decided. However, the plain language of § 605(a) appears to support Zuffa's argument. See, e.g., National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d at 915-917; DirecTV, Inc. v. Collins, No. 3:03cv204, 2005 WL 5581762, *4 (S.D. Ohio Mar. 4, 2005); That's Entertainment, Inc. v. J.P.T., Inc., 843 F. Supp. 995, 999 (D. Md. 1993).

**B.     Zuffa's copyright claim**

**1.     Liability under 17 U.S.C. § 501**

Under 17 U.S.C.§ 106, a copyright owner has exclusive rights to do and authorize the following:

> (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

Id. Section 501 of Title 17 provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author . . . is an infringer of the copyright of the author, as the case may be."

To prevail on a claim of copyright infringement, a plaintiff must prove ownership of a valid copyright and a violation of at least one of the exclusive rights granted to holder of the copyright under § 106. E.g., A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001). In this case, Zuffa has presented sufficient evidence to satisfy both elements.

In particular, Zuffa has presented a certificate of registration of its copyright for the UFC #123 Broadcast that defendants have not disputed.[4] This is sufficient to establish the first element. Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1233 (11th Cir. 2010);17 U.S.C. § 410.

---

[4] Defendants do not dispute that the UFC #123 Broadcast is subject to copyright protection. See, e.g., National Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 845-848 (2d Cir. 1997).

9

As for the second element, Kamranian has acknowledged that he streamed the UFC #123 Broadcast from the firstrowsports.com website onto a computer in his restaurant and caused it be displayed on three monitors in view of the restaurant's customers. Absent the applicability of the exemption claimed by defendants under 17 U.S.C. § 110(5), defendants' display of Zuffa's copyrighted Broadcast in view of restaurant customers infringed upon one or more of Zuffa's exclusive rights under § 106. See, e.g., National Football League v. PrimeTime 24 Joint Venture, 211 F.3d 10, 12 (2d Cir. 2000) ("[e]ach and every method by which [ ] images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of [§ 106(4) or (5) ]", quoting H.R.Rep. No. 94-1476, at 64 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678); WPIX, Inc. v. ivi, Inc., 765 F. Supp. 2d 594, 597-601 (S.D.N.Y. 2011) (prima facie case established for copyright infringement against entity that simultaneously streamed copyrighted broadcasts for public display).

Defendants make several arguments for why they should not be held liable for infringement of Zuffa's copyright.[5] Their primary argument is that they are entitled to an exemption from liability under 17 U.S.C. § 110(5). This argument is addressed separately below.

Defendants also argue that they were unaware that the display of the UFC # 123 Broadcast violated Zuffa's copyright. In addition, they argue that Zuffa should be estopped in its claim of copyright because it was aware firstrowsports.com was streaming UFC broadcasts and failed to take

---

[5] The court understands defendants not to be claiming that they possessed a valid license or other similar right to publically display the UFC #123 Broadcast, aside from their claim of exemption under 17 U.S.C. § 110(5), which is addressed separately below. But, even if the court's understanding is wrong, Zuffa presented evidence that defendants did not possess a license or other comparable right to display the UFC # 123 Broadcast commercially, and defendants have failed to come forward with any proof to the contrary. See, e.g. Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 398 (6th Cir. 2007); Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc., 128 F.3d 872, 884 (5th Cir. 1997).

prompt action to protect its rights. Defendants argue that, by allowing the infringement to continue, Zuffa acquiesced to the use of this material by those accessing the website and using the material without notice of Zuffa's rights.

While it may be that one or both of these latter points can be considered in mitigation of damages, they are not defenses to liability. "Once a plaintiff has proven that he or she owns the copyright on a particular work, and that the defendant has infringed upon those 'exclusive rights' . . . the defendant is liable for the infringement and this liability is absolute." Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d 635, 637 (8th Cir. 1996) (quoting Pinkham v. Sara Lee Corp., 983 F.2d 824, 829 (8th Cir. 1992)). The state of mind of the infringer is relevant, if at all, only to the award of damages. Id. "Innocent" and "willful" are terms of art in copyright law, which, if proved, may have a bearing on the amount of statutory damages awarded but cannot affect liability. Id. Finally, defendants have not offered any authority for their argument that Zuffa lost its right to pursue defendants by allegedly failing to vigorously pursue the initial infringer. Further, even if there was such a defense, defendants have failed to proffer submissible evidence sufficient to support it.

### 2. The "homestyle" exemption under 17 U.S.C. § 110(5)(A)

Section 110 of Title 17 U.S.C. provides a list of exemptions from liability under §106 including the following:

> (5)(A) except as provided in subparagraph (B), communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless–
>     (i) a direct charge is made to see or hear the transmission; or
>     (ii) the transmission thus received is further transmitted to the public

17 U.S.C. § 110(5).[6] The exemption provided for in § 110(5)(A) is commonly referred to as the "homestyle" exemption. Before turning to the arguments of the parties, some background regarding this exemption is in order.

The Eighth Circuit explained the reason for the adoption of the "homestyle" exemption in National Football League v. McBee & Bruno's, Inc., 792 F.2d 726 (8th Cir. 1986) as follows:

> The home-use exemption was included in the 1976 Copyright Act specifically in response to the Supreme Court's decision in Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). Aiken held that the owner of a small fried-chicken restaurant was not "performing" copyright works when he played a conventional radio through four in-the-ceiling speakers for the benefit of customers and employees. According to the legislative history of the 1976 Act, an act such as Aiken's would be considered a performance; to decide whether an infringement had occurred, the critical question instead would be the type of equipment used by the putative infringer. Calling "the use of a home receiver with four ordinary loudspeakers ... the outer limit of the exemption," the drafters then said:
>
>> the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial 'sound system' installed or converts a standard home receiving apparatus ... into the equivalent of a commercial sound system.
>
> H.R.Rep. No. 94-1476 at 87, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad. News 5659, 5701.

Id. at 730-31.

Notably, the same House Report referenced by the Eighth Circuit states more completely in relevant part:

> Unlike the first four clauses of section 110, clause (5) is not to any extent a counterpart of the 'for profit' limitation of the present statute. It applies to performances and displays of all types of works, and its purpose is to exempt from copyright liability anyone who merely turns on, in a public place, an ordinary radio

---

[6] The provisions in subparagraph (B) are not applicable here.

12

> or television receiving apparatus of a kind commonly sold to members of the public for private use.
>
> The basic rationale of this clause is that the secondary use of the transmission by turning on an ordinary receiver in public is so remote and minimal that no further liability should be imposed. In the vast majority of these cases no royalties are collected today, and the exemption should be made explicit in the statute. This clause has nothing to do with cable television systems and the exemptions would be denied in any case where the audience is charged directly to see or hear the transmission.
> * * * *
> Under the particular fact situation in the Aiken case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the performances would be exempt from clause (5). However, the Committee considers this fact situation to represent the outer limit of the exemption, and believes that the line should be drawn at that point. Thus, the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial 'sound system' installed or converts a standard home receiving apparatus (by augmenting it with sophisticated or extensive amplification equipment) into the equivalent of a commercial sound system. Factors to consider in particular cases would include the size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving apparatus is altered or augmented for the purpose of improving the aural or visual quality of the performance for individual members of the public using those areas.

H.R.Rep. No. 94-1476 at 86-87, 94th Cong., 2d Sess., reprinted in 1976 U.S.C.C.A.N. 5659, 5700-01. Finally, the Conference Report stated:

> With respect to section 110(5), the conference substitute conforms to the language in the Senate bill. It is the intent of the conferees that a small commercial establishment of the type involved in Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975), which merely augmented a home-type receiver and which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt. However, where the public communications was by means of something other than a home-type receiving apparatus, or where the establishment actually makes a further transmission to the public, the exemption would not apply.

H.R. Conf. Rep. No. 94-1733 at 76, 94th Cong., 2d Sess., reprinted in 1976 U.S.C.C.A.N. 5809, 5816.

13

The Eighth Circuit has made clear that, in applying the "homestyle" exemption, the court must look to the actual language of the statute, which the court characterized as focusing on the equipment being used as the primary determinant of the exemption's applicability. Edison Bros. Stores, Inc. v. Broadcast Music, Inc., 954 F.2d 1419, 1424 (8th Cir. 1992) ("The statute focuses on the equipment being used, and so must we."). In fact, the court went on to state in Edison Bros. Stores that, while the foregoing legislative history was "interesting," it was "beside the point" with respect to any suggestion in the legislative history that the size of the facility would be a factor, since the actual language of the exemption makes no reference to size. Id.

In focusing, then, upon the equipment being used as the primary determinant, the use of the word "apparatus" suggests that the entire package of equipment being used needs to be considered and not simply the piece of equipment that initially was used to receive the broadcast. E.g., Cass County Music Co. v. Muedini, 55 F.3d 263, 267 (7th Cir. 1995); see New World Music Company (LTD) v. Tampa Bay Downs, Inc., No. 8:07–cv–398, 2009 WL 35184, *9 (M.D. Fla. Jan. 6, 2009); Hickory Grove Music v. Andrews, 749 F. Supp. 1031, 1037 (D. Mont. 1990); Merrill v. Bill Miller's Bar-B-Q Enterprises, Inc., 688 F. Supp. 1172, 1175 (W.D. Tex. 1988). Further, even if all of the pieces of equipment used are home-type components, the exemption does not apply if the components are configured in a way not commonly used in a home. See id.

Defendants argue that the equipment they used here, *i.e.* a computer, monitors, and connecting video cable are now ubiquitous in terms of home use. The court would tend to agree. However, where the court parts company with the defendants' position is whether the manner in which the components were configured and used is presently "common" in a home.

14

In today's world, the use of computers in a home environment is "common." The use of a computer to receive and view a video performance streamed over the internet, while no doubt frequently done, may be borderline "common" for purposes of the "homestyle" exemption. This is because it requires a greater degree of knowledge than what is required to simply turn on a tv or radio and find the right channel. Also, and probably more significantly, streaming and displaying video requires a certain amount of bandwidth to do it in manner that is presentable, and there may be some questions whether a sufficient number of households not only have internet service but also have the requisite bandwidth to stream and display video from the internet in a consistently presentable form. Cf. Cass County Music Co. v. Muedini, 55 F.3d at 268-69; National Football League v. McBee & Bruno's, Inc., 792 F.2d at 730-31.

If this was all that the court needed to consider, this would be a close case and one that possibly would not be amenable to summary judgment. What the court concludes is not yet sufficiently "common" in terms of household use is using multiple large external monitors to display the streaming video, separate from or in addition to the smaller monitor or screen (in the case of a laptop) that typically accompanies the sale of a computer. In other words, the court does not believe that one can *yet* enter a sufficiently large enough number of homes in the United States and find persons using a computer to stream video off the internet for display simultaneously on multiple large external monitors for the court to conclude this is common home use.[7] Id.; cf. U.S. Songs, Inc.

---

[7] Another significant difference between this case and what it appears Congress intended with its enactment of the "homestyle" exemption is that, typically, the particular programs on a television or the music on a radio that businesses like the local barbershop would offer their customers on a casual basis are free to someone viewing or hearing the same content at home using the same type of equipment. In other words, any fees for use of the material that were owed to copyright holders were paid by the television or radio station (or, perhaps, some other entity earlier in the distribution scheme), and no one, including the copyright holders, contemplated collecting additional amounts from homeowners for the specific programs or songs. In this case, the holder of the copyright and the persons to whom they licensed the material clearly contemplated that the ultimate persons or entities displaying the material would be charged
(continued...)

v. Downside Lenox, Inc., 771 F. Supp. 1220, 1227 (N.D. Ga.1991); Broadcast Music, Inc. v. Jeep Sales & Service Co., 747 F. Supp. 1190, 1193 (E.D. Va. 1990). At the very least, defendants have not come forward with submissible evidence demonstrating that to be the case and the burden is upon them to establish the availability of the exemption, which is an affirmative defense. See, e.g., Broadcast Music, Inc. v. Hartmarx Corp., No. 88 C 2856,1989 WL 121290, *2 (N.D. Ill. Oct. 5, 1989); National Football League v. Rondor, Inc., 840 F. Supp. 1160, 1167 (N.D. Ohio1993).

Consequently, the court concludes the "homestyle" exemption is not available.[8]

**C.     Damages**

Zuffa alleges that defendants' unauthorized exhibition of the UFC #123 Broadcast constituted a willful and knowing violation of its copyright. It seeks statutory penalties under 17 U.S.C. § 504 in an amount the court deems appropriate up to the statutory maximum for a willful violation of $150,000. In addition, it seeks an award of costs and attorney's fees pursuant to 17 U.S.C. § 505.          Section 504(a) provides that, except as otherwise provided by Title 17, an

---

[7](...continued)
for the right to view it or display it to others and this would include homeowners who would be required to pay on a "pay per view" basis. While it seems unlikely that Congress intended that the "homestyle" exemption would apply to a limited distribution of works on a "pay per view" basis, it is not clear there is a basis for making this distinction based on the statutory language. Given the conclusions reached above and the fact that the parties have not argued this point, the court will not reach it here. However, the court does note that the language of the exemption makes reference not just to the reception of the transmission of the copyrighted material by a single receiving apparatus commonly used in private homes but to its "public" reception.

[8] Zuffa also argues that the exemption is inapplicable due to the fact that the broadcast was "further transmitted" to the public, and cites to International Korwin Corp. v. Kowalczyk, 665 F. Supp. 652, 657 (N.D. Ill. 1987) (overruled on other grounds); see also Blue Seas Music, Inc. v. Fitness Surveys, Inc., 831 F. Supp. 863, 866 (N.D. Ga. 1993). To "transmit" a performance is to "communicate [the performance] by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. "To further transmit a performance must mean more than to run speaker wire through a wall. It must entail the use of some device or process that expands the normal limits of the receiver's capabilities." Broadcast Music, Inc. v. Claire's Boutiques, Inc., 949 F. 2d 1482, 1495 & n.4 (7th Cir. 1991) (distinguishing the line of cases cited by Zuffa re "further transmission."). The court does not have to reach this argument given the conclusions reached above. However, the computer and monitors in this case were all on the restaurant's premises, and the court suspects most home computers would support the simultaneous use of multiple monitors. See id.

infringer is liable for either the copyright owner's actual damages, including in some cases the infringer's profits, or statutory damages. With respect to the latter, § 504(c) states:

> (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.
> (2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. * * * *

Trial courts have wide discretion in awarding an amount that is within the foregoing range of statutory damages, including providing restitution of profit, reparation for injury, and discouraging wrongful conduct. E.g., F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 231-32 (1952); Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899, 909-10 (8th Cir. 2012); Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d at 642-43. "Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." F.W. Woolworth Co, 344 U.S. at 233.

In addition to statutory costs, 17 U.S.C. § 505 provides: "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States . . . . Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."

While there was some discussion during the court's last telephonic conference about the court making an award based on the present record, no final determination was made. Consequently, the court will schedule a status conference to discuss how the parties wish to proceed.

### III. CONCLUSION

Based upon the foregoing, Zuffa's Motion for Amended Summary Judgment (Docket No. 59) is **GRANTED** as to liability and Kamranian's Motion for Summary Judgment (Docket No. 29) is **DENIED**. The issue of a damages and other relief that may be appropriate is reserved for the court's future consideration.

**IT IS SO ORDERED.**

Dated this 25th day of March, 2013.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge