**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | |
|---|---|
| Zuffa, LLC, d/b/a The Ultimate Fighting Championship (UFC), ) ) ) Plaintiff, ) ) vs. ) ) ) Reza T. Kamranian, Individually and as ) officer, director, shareholder and/or principal) of Kamranian, Inc., d/b/a Reza's Pitch, a/k/a ) Reza's Pitch-Burgers & Beer, a/k/a Reza's ) Pitch Burgers & Beer; and Kamranian, Inc., ) d/b/a Reza's Pitch, a/k/a Reza's ) Pitch-Burgers & Beer, a/k/a Reza's Pitch ) Burgers & Beer, ) ) Defendants. ) | **ORDER DETERMINING DAMAGES AND FOR ENTRY OF JUDGMENT** Case No.: 1:11-cv-036 |

## I. BACKGROUND

In this action, plaintiff Zuffa, LLC ("Zuffa") sued defendants for an unauthorized showing of an "Ultimate Fighting Championship" event (herein the "UFC #123 Broadcast" or "Broadcast") in defendant Reza Kamranian's sports bar, Reza's Pitch. Zuffa asserted two claims. The first was for a violation of the Communications Act of 1934, codified at 47 U.S.C. § 605(a), and the second for copyright infringement under 17 U.S.C. § 501.

On March 25, 2013, the court entered an order pursuant to cross-motions for summary judgment adjudging defendants liable on the copyright infringement claim and denying the Communications Act of 1934 claim. Zuffa, LLC v. Kamranian, No. 1:11-cv-036, 2013 WL 1196632 (D.N.D. Mar. 25, 2013). On October 24, 2013, the court conducted a trial on the damages.

1

## II.  FINDINGS AND CONCLUSIONS RE DAMAGES

The court makes the following findings of fact and conclusions of law with respect to damages for defendants' copyright infringement.

1. Unless otherwise indicated, the court relies upon the uncontested facts set forth in the court's earlier order granting summary judgment.

2. Reza's Pitch is a small "burger and beer" sports bar featuring a soccer theme. The proprietor is defendant Reza Kamranian.

3. The unauthorized showing of the UFC #123 Broadcast took place on Saturday evening, November 20, 2010. Earlier that week and again in the late afternoon of the day of the Broadcast, Brian Fox, an investigator working on behalf of Zuffa or its commercial distributor, contacted Reza's Pitch about whether the upcoming UFC fight would be shown. Fox was advised that it would be shown, but not until after the completion of the Dakota Wizards' basketball game.

4. Fox arrived at Reza's Pitch on the evening of the Broadcast at about 9:30 p.m. At that time there were 28 patrons on the premises, about 20 of whom were gathered in a group on one side of the bar and were Wizards' fans. Kamranian had a special arrangement with the Dakota Wizards, a local "D League" professional basketball team, to show their "away" games by way of an internet feed. The Wizards' group also included several of the team's office staff,  family and friends of the players, and some fans.

5. There were eight television screens in Reza's Pitch on the night of the Broadcast. Kamranian had cabling running from a computer in his office to three of the televisions, which he occasionally used to display sporting events streamed from the internet - most often soccer matches not shown on cable television (consistent with the theme of the bar and the establishment's targeted

customers) as well as games for both the Wizards and the Bismarck Bobcats semi-professional hockey team. When not used for this purpose, the televisions could be reconnected to the restaurant's cable television service for showing regular sports programming from the four major networks and cable sports channels such as ESPN.

6. Upon the conclusion of the Wizards' game, Kamranian went onto the computer in his office to switch to the website firstrowsports.com where he caused to be streamed to his computer the UFC #123 Broadcast for display on the three connected televisions that previously had been showing the Wizards' game. When the switch occurred, the UFC #123 Broadcast was already underway and was in the middle of one of the "undercard" matches preceding the featured fight.

7. Investigator Fox remained in the restaurant for about fifteen minutes, long enough to take head counts of the persons in the restaurant when he arrived and when he left, count the number of televisions, estimate the seating capacity, and document the unauthorized usage of the UFC #123 Broadcast.

8. There were two or three locations in Bismarck that had purchased the rights to display a closed-circuit television or satellite feed of the UFC #123 Broadcast. Investigator Fox audited a total of eleven establishments in the Bismarck area that had not purchased a license for the Broadcast. In addition to Reza's Pitch, he discovered one other violator. The estimated cost for a site license to show the UFC # 123 Broadcast at a location with the seating capacity of Reza's Pitch (110 persons) was $1200.

9. The evidence indicates the UFC #123 Broadcast generated little interest amongst the patrons in Reza's Pitch. The Wizards' fans were more intent on socializing following the game and that group slowly dwindled. As for the few others in the bar, it is not clear whether they were

paying attention to the Broadcast, watching what was being displayed on the five other televisions (which were showing either a college football game or a soccer match), or were present simply to eat or drink and were not watching anything.  The only patron documented as actually paying attention to the Broadcast was Investigator Fox.  Kamranian testified that he watched a couple of minutes of the Broadcast when it was first displayed and did not observe anyone else who was interested in it.  During the fifteen minutes while Investigator Fox was present, the head count dropped to 22.

      10.  Reza's Pitch did not advertise or otherwise promote the display of the UFC #123 Broadcast.  Also, it did not impose a "cover charge" or impose a "drink minimum" in relation to its showing.  In fact, the promotion for the evening in question was the showing of the Wizards' game.  Based on the fact that most, if not all, of the patrons in Reza's Pitch on the night in question were there for purposes other than watching the UFC #123 Broadcast, except for Investigator Fox, it appears clear  that Reza's Pitch did not derive any economic benefit from its showing.  Also, this was further reinforced by evidence of a comparison that was made between the receipts for the night in question with another night when a Wizards' game was shown without a follow up UFC broadcast.  The total receipts were virtually identical.

      11.  Likewise, it appears unlikely that the copyright holders suffered any real financial loss from the casual showing of the UFC #123 Broadcast in Reza's Pitch for the following reasons:

- The court finds credible Kamranian's testimony that he would never have purchased a site license for the UFC #123 event, which was estimated to be $1200, because he could not make it profitable given the smaller size of his bar as well as his customer base.

- Most of the patrons in Reza's Pitch on the night in question were there specifically to view the Wizards' game, and it is improbable that, but for the display of the UFC Broadcast in the bar, they would have been in their homes watching the Broadcast on "pay-per-view" or would have been in one of the other establishments in town that was showing the Broadcast pursuant to a proper license. As for the handful of other customers who were present, there is no direct evidence that any of them were interested in the match as discussed earlier. Kamranian testified the only person in the bar who verbally expressed an interest in the match was Investigator Fox and that they likely switched the televisions in question over to regular sports programming not long after he left because of lack of interest. The court finds this testimony to be credible. Also, with respect to the few remaining customers, there are two other reasons why it is unlikely that they came to Reza's Pitch to watch the UFC #123 Broadcast in lieu of watching it at home by "pay per view" or in one of the places in Bismarck that was displaying a licensed feed of the Broadcast. The first is that the video that Kamranian streamed from the internet was not high definition and was otherwise of below average quality. Further, it was interrupted by "commercials" that were not part of the regular Broadcast. Serious UFC fans would in all likelihood have wanted a better viewing experience. Also, they likely would have gone to a location where they could have seen the entire event. At Reza's Pitch, the Wizards' game was being shown on the only television screens that could be used for displaying content streamed from the internet. And, not only did the Wizards' game

>   overlap the UFC #123 Broadcast, there was no advance guarantee when that game would end and any switch over to the UFC Broadcast could take place.

12.  The court finds credible the evidence that Reza's Pitch did not on any other occasion seriously promote the showing of a UFC event.  Further, the court also finds credible the evidence that, since the assertion by Zuffa that an unlicensed showing of its product from websites like firstrowsports.com is unlawful, Reza's Pitch has not displayed any UFC broadcasts.  There is evidence, however, that supports the conclusion that Reza's Pitch may have previously displayed on a casual basis parts or all of one or more other UFC events on a limited number of screens when nothing else of priority or of other particular interest to its customers was on.  This evidence includes one mention of a prior UFC event on the bar's Facebook page as well as someone (most probably Kamranian) stating to Investigator Fox that it would be showing the UFC #123 Broadcast following the Wizards' game when Fox contacted Reza's Pitch prior to the Broadcast.  Notably, when Fox made the contact, there was no expression of unfamiliarity with the upcoming Broadcast or doubt expressed about whether it was available and could be shown.  Further, when the Wizards' game ended, Kamranian appears to have had no difficulty locating the unauthorized Broadcast.

13.  Kamranian testified he did not understand that the display of the UFC #123 Broadcast was in violation of a law or copyright of Zuffa[1] based cumulatively on the following:

- The website firstrowsports.com stated that its content was free and there was nothing on the website which indicated that the UFC content being displayed was licensed or restricted in any fashion, such as for residential use only. Kamranian testified this

---

[1] Kamranian has not any point conceded his "homestyle" defense to Zuffa's claim of copy infringement, which was rejected in the court's prior order.

        differed from his experience with respect to the internet streaming of Bobcat Hockey games where there was an $8 per game charge, but the website made clear this charge was for home viewing only, which then led him to purchase through the Bobcats a $1,000 per year license.

- The picture quality was second rate and interrupted by ads.  Further, there were ads from nationally recognized products on the website, such as Pizza Hut, Capella University, and Lenovo.  Kamranian testified this suggested to him that the website's advertising was paying for the second-rate content being made available and that the licensed UFC product available through special satellite or cable television feeds was for a much higher quality, advertisement-free product that would be of interest to serious UFC event viewers.

On the other hand, there was conflicting evidence suggesting that Kamranian was a sophisticated computer and  internet user and that he did not make any serious attempt to confirm the legality of what was being shown on the website in terms of restricted content such as UFC events.

        Section 504(a) provides that, except as otherwise provided by Title 17, an infringer is liable for either the copyright owner's actual damages, including in some cases the infringer's profits, or statutory damages.  In this case, Zuffa has elected the latter.  And, with respect to statutory damages, § 504(c) further provides:

> (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.
> (2) In a case where the copyright owner sustains the burden of proving, and the court

> finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. * * * *

After weighing the conflicting evidence and while it is a close question, the court finds that Zuffa has not carried its burden of demonstrating that the display of the UFC #123 Broadcast by defendants was "willful" within the meaning of the federal copyright law.  In the Eighth Circuit, "willful" in this context means acting with actual knowledge that an act constitutes an infringement or in reckless disregard of a copyright holder's rights.  E.g., RCA/Ariola Intern., Inc. v. Thomas & Grayston Co., 845 F.2d 773, 779 (8th Cir. 1988); Broadcast Music, Inc. v. Edcon Enterprises, LLC, No. 4:11–CV–1950, 2012 WL 5508485, at *3 (E.D. Mo. Nov. 14, 2012) ("Broadcast Music").  On other hand, while defendants' conduct may not have been reckless, they were at least negligent and, for that reason, not eligible for a reduction of statutory damages below $750.

      14. Trial courts have wide discretion in determining statutory damages, including providing restitution of profit, reparation for injury, and discouraging wrongful conduct.  E.g., F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 231-32 (1952); Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899, 909-10 (8th Cir. 2012);  Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d 635, 642-43 (8th Cir. 1996).  "Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy."  F.W. Woolworth Co, 344 U.S. at 233.  Also, the court can consider the size and nature of a defendant's business, keeping in mind that the damage provisions of the copyright laws are designed to address a wide range of infringing conduct from a single instance of

demonstrated infringement by a small violator to multiple violations by large infringers on a nationwide basis.  E.g., Broadcast Music, 2012 WL 5508485, at *2.

In addition to statutory costs, 17 U.S.C. § 505 provides: "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States . . . . Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  As noted in Broadcast Music, the Eighth Circuit has not adopted a definitive standard for when to award attorney's fees for copyright infringement.  The court concludes, as the court did in Broadcast Music, that the court has substantial discretion and is free to consider any number of factors including the merits of the positions taken by the parties as well as the factors relevant to the determination of the statutory penalty, including considerations of compensation, deterrence, the egregiousness of the violation, and the size of the violator.  Id. at *5.

15. Zuffa submitted a total request for attorney's fees in the amount of $17,859.50 for 64.72 hours of work that was broken down as follows:  partner time of 0.7 hrs at $500 per hour for a total of $350; associate attorney time of 55.42 hours at $300 per hour for a total of $16,626.00; and paralegal time of 9.3 hours at $95 per hour for a total of $883.50.

Defendants object to the amount requested for associate attorney time.  They argue that $150 is more reasonable for this market, relying upon an award made by this court in 2005.  Defendants suggest that this would reduce the total amount of fees to $8,900.  Defendants further suggest that the court should discount this amount by 75% because Zuffa did not prevail on its Communications Act of 1934 claim, resulting in a net award of an amount not greater than $2,225 if the court is inclined to award attorney's fees.

9

Notably, defendants do not object to the amount of time claimed by Zuffa's attorneys. In reviewing the itemized breakdown, the time spent on the individual work items is very modest and obviously reflects the expertise of Zuffa's counsel, the efficiencies of handling a large volume of work of this type, and an efficient use of associate attorney and paralegal time. While the court agrees that the amount claimed for associate attorney time is in excess of the local prevailing rates,[2] the court suspects that local counsel would have had to spend more time completing the same amount of work and that the total amount would not have been significantly less. Also, if the court based its award solely upon the issues that Zuffa prevailed upon and did not consider other factors, the proposed 75% adjustment would be too great. That being said, the court is going to limit the award of attorney's fees but for the reasons set forth below.[3]

16.     In this case, the court concludes that an award equal to what would have the approximate license fee, or $1200, along with a partial award of attorney's fees in the amount of $3,000.00 is the most appropriate outcome given the particular and somewhat unique circumstances of this case, including: (a) the fact that the violation was a partial showing of one copyrighted UFC Broadcast, which was not promoted; (b) the likelihood that Zuffa suffered no direct economic loss and defendants no direct economic benefit; (c) the court's conclusions regarding lack of wilfulness; (d) defendants' representation that it has not since shown a UFC event and would not do so in the future under the same circumstances - at least absent a court determination as to its lawfulness; (e) the relatively small "mom and pop" size of defendants' operation; (f) the fact Zuffa did not prevail

---

[2] See Hayden v. Blue Cross and Blue Shield of Texas, No. 1:10-cv-00050, Doc. No. 110 (D.N.D. Oct. 23, 2012) (awarding to local counsel $300 per hour for senior partner time, $150 to $200 per hour for associate attorney time, and $120 per hour for paralegal time).

[3]

on its Communications Act of 1934 claim; (g) the fact this is the first *claim* of copyright violation brought against defendants (although possibly not their first violation); and (h) the fact that a total award in this range provides sufficient deterrent value both as to defendants (particularly when also considering their own expenditure of attorney's fees) as well as others in the community (particularly given the court's reasoning from which it can readily be inferred that a greater amount would have been awarded if the circumstances were more egregious). Finally, if defendants disappoint the court by again being caught in an act of copyright infringement, the court is free to impose a much greater punishment, if for no other purpose than to further the statutory policy of the Copyright Act.

### III.     ORDER FOR JUDGMENT

Based upon the foregoing, is hereby **ORDERED, ADJUDGED, AND DECREED** that Zuffa have judgment against the named defendants, jointly and severally, in the amount of $1,200 in statutory damages for the single copyright violation alleged in the complaint and $3,000 in attorney's fees, for a total judgment amount of $4,200. Each party shall otherwise bear its own costs and no prejudgment interest is awarded. Zuffa's complaint is dismissed with prejudice as to all other matters.

**IT IS SO ORDERED.**

Dated this 3rd day of February, 2014.

*/s/  Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge